IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 NOV -6 PM 3: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

ANGELA BIVINS and )
AMY MCCANTS-THREATT, )
)
            Plaintiffs, )
)
v. )   CASE NO. CV-01-TMP-2726-S
)
RIVERCHASE ASSISTED )
LIVING, LTD., )
)
            Defendant. )

**ENTERED**

**NOV - 6 2002**

## MEMORANDUM OPINION

   This action is before the court on a motion for summary judgment filed June 19, 2002, by defendant Riverchase Assisted Living, Ltd., ("Riverchase"). The motion has been supported by deposition excerpts, documents, an affidavit, and a brief. The plaintiffs filed a brief in response on July 9, 2002, and offered deposition excerpts and documents in support of their opposition. Riverchase filed a brief in reply on July 19, 2002. The parties have consented to the jurisdiction of the undersigned magistrate judge; accordingly, the court enters this memorandum opinion.

## I.  SUMMARY JUDGMENT STANDARD

   Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the



affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest

-2-

on his pleadings.  <u>Celotex</u>, 477 U.S. at 324.  "[T]he plain language
of Rule 56(c) mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against a party who
fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial."  <u>Id</u>. at 322.

     After the plaintiff has properly responded to a proper motion
for summary judgment, the court must grant the motion if there is
no genuine issue of material fact, and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The
substantive law will identify which facts are material and which
are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).  A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
<u>Id</u>. at 248.  "[T]he judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial."   <u>Id</u>. at 249.  His
guide is the same standard necessary to direct a verdict: "whether
the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law."  <u>Id</u>. at 251-52; <u>see also</u> <u>Bill</u>
<u>Johnson's Restaurants, Inc. v. N.L.R.B.</u>, 461 U.S. 731, 745 n.11
(1983).  However, the nonmoving party "must do more than show that

-3-

there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

For purposes of determining defendant's motion for summary judgment on all of the plaintiffs' claims, the court views the following facts as undisputed.  Both plaintiffs are African

-4-

American females who worked in nursing and supervisory positions for Riverchase, which operates The Park at Riverchase ("The Park"), an assisted living facility for senior citizens located in Hoover, Alabama.   Both plaintiffs claim that they were discriminated against on the basis of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and in violation of 42 U.S.C. § 1981.

### A.  Amy McCants-Threatt

Amy McCants-Threatt was hired as a full-time licensed practical nurse ("LPN") on March 20, 2000.   She interviewed with and was hired by Melissa Frank, who is white.   She was supervised by Frank, a registered nurse ("RN"), when she worked as an LPN. Her job duties included providing nursing care to residents, monitoring residents' health, administering medication, documenting medical care, and supervising nursing assistants.  Upon hiring, she received an employee handbook that included a policy prohibiting discrimination and instructing employees to report any such conduct to the executive director or human resources representative of The Park.  The handbook also contained a copy of Riverchase's standards of conduct.  The standards include a rule notifying employees that falsification of company records is a serious violation that may result in termination of employment.

-5-

Frank subsequently was transferred into the marketing department, although she retained some duties of supervising the LPNs. Frank's supervisory job was split into two newly-created supervisory positions. On February 11, 2001, Michelle Pendley, executive director of The Park, promoted Threatt to the one of the new jobs, naming her as Resident Care Coordinator for the special care unit. She received a pay raise, and supervised a nursing staff that comprised mostly whites.

Threatt alleges that her promotion was opposed by three white nurses: Linda Lee, Sue Cummings, and Gina Ramsey. She claims that Lee and Cummings refused to complete assignments made by Threatt, and that Ramsey and Lee verbally expressed opposition to Threatt's promotion.[1] Threatt wanted to discuss her "concerns" and "issues" about the unit with Pendley, but Pendley rescheduled the meeting more than once, and it did not occur before Threatt was terminated. Threatt has testified that she did not describe the "issues" or "concerns" to Pendley and did not tell Pendley that she wanted to discuss racial matters or discrimination of any kind. Threatt has testified that she does not believe Pendley was trying to avoid meeting with her and that she recalls that the meetings were

---

[1]    Threatt also complains that Lee wrote or was involved in writing a letter titled "Weekenders" in which nurses who worked weekends opposed the promotions of Bivins and Threatt. The letter has been attached as an exhibit by defendant, and an examination of that letter leads the court to conclude that nothing in the letter criticizes or opposes the plaintiffs.

rescheduled because Pendley had a family illness or emergency.

Threatt also alleges that she was excluded from "stand-up" meetings that were open to white supervisors. Threatt alleges that before her promotion the meetings were held three or four days a week, and that after her promotion she attended only three such meetings.[2]

During March 2001, Frank received a complaint relating to Threatt from a family member of a special care area resident. The family member reported that her mother had not received her daily skin care treatments and had not been given her nutritional supplement. Frank examined the resident's charts and found that the skin care and supplements were recorded as having been administered. The family member informed Frank that the charts must be wrong. Frank discussed with Threatt the importance of accurate chart maintenance. Threatt told Frank that she had withheld the resident's nutritional supplements because it caused diarrhea, although the chart reflected that the supplements were given.

---

[2]     Bivins testified that she had seen the meetings occur regularly before her promotion and before she would be eligible to attend as a management employee, and that she did not know if meetings were regularly held after her promotion. Bivins also alleges that she was excluded from luncheon meetings, but the only meeting she can describe is one that involved marketing functions. Pendley and Frank have testified that, while employees were free to eat their lunches together in the conference room, the lunches were not meetings organized by or mandated by management.

On March 29, 2001, Cheryl Kingma, Riverchase's Regional Wellness Director, discovered medication in a kitchen drawer of the special care area.  The medicine was supposed to have been administered to the appropriate residents that morning.  Threatt was responsible for administering the medications on that date. Threatt denied leaving the medication in the drawer.  On April 24, 2001, a personal care attendant found 14 pills in medication cups in the same drawer.  Some of the medications were deemed life-sustaining.  Those pills also were supposed to have been administered early in the morning of that day.

On April 25, 2001, Pendley suspended Threatt, pending further investigation, on the basis that medications had not been properly administered on days Threatt was responsible for the medications. The subsequent investigation led Pendley and Frank to conclude that it was Threatt who was responsible for the morning medication administration, and that Threatt had signed the records falsely indicating that the medicine had been given to residents.

Another complaint was lodged against Threatt during the investigation.  A family member of a resident under Threatt's care reported that Threatt had failed to administer a breathing treatment to the resident as the doctor's orders required on April 25, 2001.  Frank discovered that Threatt had charted the breathing procedure as being administered at 1:00 p.m., as ordered.  The resident's sister, however, told Pendley that she was with the

-8-

resident from 12:30 until 4:30 p.m. on the day the treatment was supposed to be given and that Threatt did not perform the treatment.  Pendley has testified that the failure to perform the required medication duties was a serious medication error.  Threatt asserts that she did perform the treatment at 12:05 p.m. that day, before the sister arrived.

On April 27, 2001, Pendley fired Threatt on the basis that Threatt had failed to administer the medications found in the drawer on April 24, 2001.  Pendley also based the discharge on the fact that Threatt had falsely documented that the pills had been given to the residents, even though Pendley had previously counseled Threatt on her false documentation regarding the breathing treatment and the dietary supplements.  On April 30, 2000, Threatt filed a claim of race discrimination with the Equal Employment Opportunity Commission ("EEOC").

Threatt claims Eva Bradley, a white employee, was not terminated for making medication errors after Bradley failed to administer heart medication to a resident as prescribed.[3]  Bradley was disciplined for failing to post a resident's allergies on his chart, giving medications without a doctor's order, and posting a DNR ("do not resuscitate") instruction on a resident's chart without proper authorization.  As a result of the errors, Bradley

---

[3]     Bradley apparently administered the medication every day for 13 days instead of every other day, as per the doctor's orders.

-9-

was given a choice of resigning or being terminated, and chose to resign.

Threatt also claims that Lee failed to properly administer heart medication, and sometimes failed to properly account for all narcotics at the end of her shift.[4]  Lee apparently did not give heart medication to a resident on certain days, but noted in the chart that the medication had not been given because it was unavailable.  Threatt alleges that Cummings, a white employee, also sometimes failed to account for narcotics at the end of her shift. Frank testified that she disciplined both Lee and Eva Bradley for medication errors.   There is no evidence that Cummings was disciplined for the alleged medication errors.

Pendley has testified that she suspended and subsequently terminated Tina West, a white nurse at The Park, for medication errors that were attributed to her.  She also terminated Mary Jo Alexander, who is white, for medication errors.  Pendley similarly testified that Bradley was suspended, and ultimately resigned under pressure, in relation to three medication errors.  Pendley recalls terminating at least four nurses at The Park for medication errors.

---

[4]      Threatt explained that at the end of a shift a nurse must "count" all pills that are narcotics to assure that the number of pills left in the inventory reflects an accurate amount of pills administered to residents.

-10-

### B.  Angela Bivins

Angela Bivins was hired on July 15, 2000, by Michelle Pendley, the executive director of The Park, who is white.  Bivens was hired as a part-time LPN.  About a month later, Bivins was promoted to a full-time LPN position at The Park as a charge nurse.  She was supervised by Frank, a registered nurse ("RN"), when she worked as an LPN.  Her job duties included providing nursing care to residents, monitoring residents' health, administering medication, documenting medical care, and supervising nursing assistants.  Upon hiring, she received an employee handbook that included a policy prohibiting discrimination and instructing employees to report any such conduct to the executive director or human resources representative of The Park.

Bivins received an oral disciplinary warning on December 26, 2000, after Frank learned that Bivins had transcribed a medication order for a certain drug onto the chart of a resident for whom that drug had not been prescribed.  The warning did not result in any pay decrease or demotion.

After Frank's transfer into marketing, Pendley on February 12, 2001, promoted Bivins to one of the new jobs, naming her as Resident Care Coordinator for the assisted living unit.  She received a pay raise.  She supervised a nursing staff that comprised mostly whites.

-11-

Bivins claims her promotion was opposed by Frank and Pendley. She claims that Frank told Cummings that Pendley had instructed Cummings and other nurses under Bivins' supervision that they did not have to perform chart audits and monthly summaries that Bivins had instructed them to do.[5]  Bivins complains that Lee opposed her promotion by voicing disapproval of the promotion, by failing to attend a mandatory meeting, and by complaining that Bivins was allowed to return to work after her suspension.[6]  Finally, Bivins alleges that Ramsey opposed her promotion by committing medication errors and by making a "24-hour report" to Lanie Sweeney instead of to Bivins on the day Bivins left to begin her suspension.  Bivins also alleges that Cummings and Mary Barnett opposed her promotion in that they did not complete their duties properly even after Bivins instructed them to do so.[7]

In early March 2001, Pendley received a report from an LPN that Bivins had made a medication error.  In response, Pendley instructed Frank to review the medication records for residents in Bivins' care.  On March 5, 2001, Frank began a random audit of

---

[5]     The allegations are based solely on hearsay.  Bivins claims that Cummings told her that Frank had said the assignments did not have to be done.

[6]     Bivins explained at deposition that Lee wanted the promotion that was given to Bivins.

[7]     Bivins argues that nurses under her charge were "openly disdainful of her authority," and states that "perhaps" the nurses sensed the lack of support that management gave Bivins.

several files of residents during that month.  Frank discovered 12

errors in records maintained or supervised by Bivins including:

   - Giving a resident Plendil twice a day instead of once a day
   due to a transcription error by Bivins;

   - Failure to timely transcribe an order for Tylenol, resulting
   in the resident missing two doses;

   - Transcription error that resulted in resident receiving 10
   more doses of Dalcusati Calcium than prescribed;

   - Failure to order March supply of Glucophage;

   - Ditropan given to resident without any doctor's order;

   - Failure to properly store narcotics

   - Chart errors.


   On March 10, 2001, Pendley learned of complaints by staff

members that Bivins was rude and unprofessional in her dealings

with other employees, and that the rude behavior took place in

front of residents and/or visitors.  On that same date, Pendley

informed Bivins that she was suspended with pay for three days

while the complaints could be investigated.

   As a result of an investigation, Pendley decided that Bivins

should not continue in a supervisory role.  As a result of errors

reported in the audit, Bivins was given a "final warning"

describing numerous medication errors and resident care issues

arising from nursing care under Bivins' supervision.  The record of

the final warning indicates that Bivins was told that further

-13-

problems would result in further disciplinary action, "up to and including termination." Bivins was transferred to her former charge nurse position, without any decrease in pay, and returned to work on March 19, 2001. On March 21, 2001, Pendley told Bivins that she needed to meet with her to discuss the written warning concerning medication errors.[8]

Bivins called in sick on March 22, however, complaining that she had a 102-degree fever. On that same day, Bivins filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"). She did not return to work until April 2, 2001.

On April 2, 2001, Pendley received a report from two white employees that Bivins had pushed a resident to the floor and had left her on the floor unassisted for more than an hour. Pendley reported the allegations to a state agency in accordance with state law. Pendley suspended Bivins with pay during the investigation. After an investigation, on April 5, 2001, Pendley determined that the employees who reported the alleged pushing incident had misrepresented what had happened. Pendley fired the two white nurses who made the allegations, and reinstated Bivins.

On May 2, 2001, Bivins resigned from her job, stating that her reasons for leaving were race discrimination, emotional harassment,

---

[8] The warning was dated March 22, 2001, but was not presented to Bivins on that date because she did not return to work on that date as scheduled.

-14-

and retaliation.  It was the first time she complained that any of her problems on the job were related to her race.

### III. DISCUSSION

The defendant moves for summary judgment on all of plaintiffs' claims, asserting: (1) that plaintiffs have failed to establish a *prima facie* case of race discrimination, and (2) that Riverchase's articulated legitimate, non-discriminatory, non-retaliatory reason for the actions is not a pretext.  All of the race discrimination claims, whether arising under § 1981 or Title VII, are subject to the same standard.  See Sledge v. Goodyear Dunlop Tires North America, Ltd., 275 F.3d 1014 (11th Cir. 2001); Trotter v. Board of Trustees of the Univ. of Ala., 91 F.3d 1449, 1454 (11th Cir. 1996).

### A.  Plaintiffs' *Prima Facie* Case

To prevail on a claim based on circumstantial evidence, each plaintiff must demonstrate that: (1) she is a member of a protected class, (2) she is qualified for the position, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class were treated more favorably.  See Holified v. Reno, 115 F. 3d 1555, 1562 (11th Cir. 1997).  Defendant argues that plaintiffs in this case fail to show that they are

qualified for the positions,[9] and that similarly situated white nurses were treated more favorably.

In order to establish a *prima facie* case of race discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision," <u>Eskra v. Provident Life and Accident Insurance Company</u>, 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination. <u>Zaben v. Air Products & Chemicals, Inc.</u>, 129 F.3d 1453, 1457 (11th Cir. 1997).

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions.

---

[9] Defendant asserts that, because of the errors both plaintiffs allegedly made during their tenure at The Park, they became unqualified for their positions. The court assumes, without deciding, that plaintiffs meet the "qualification" element, and determine this case based on the "comparator" element, and on defendant's proferred non-discriminatory reason. Courts have frequently noted that, in termination cases, the question of qualification of the plaintiff most often is not at issue, and qualification can be inferred in some instances. <u>See</u> <u>Rosenfield v. Wellington Leisure Products, Inc.</u>, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). In this case, Bivins held her supervisory position for only about a month, and there probably would be no inference of qualification. Similarly, Threatt did not retain her position for a long period. Even so, the court declines to decide whether plaintiffs were "qualified" to be LPN supervisory nurses.

Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989).
When the plaintiff relies upon circumstantial evidence, rather than
direct evidence, she creates a presumption of discrimination by
establishing a *prima facie* case.  The presumption may be rebutted,
however, if the employer offers a legitimate, nondiscriminatory
reason for the employment action.  Once the nondiscriminatory
reason is articulated, the burden shifts to the plaintiff to show
that the reason is either not worthy of belief or that, in light of
all the evidence, a discriminatory reason more likely motivated the
decision than the proffered reason.  Standard v. A.B.E.L. Servs.
Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g en
banc denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v.
Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert.
denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In this case, plaintiffs do not offer any direct evidence of
discrimination.  They attempt to show circumstantial evidence of
race discrimination, asserting that they were treated differently
than white nurses in similar situations.  Neither plaintiff offers
any evidence of any discriminatory animus on the part of any
supervisor.

Essentially, the court must determine whether the plaintiffs
have presented competent admissible evidence that Riverchase
disciplined or demoted Bivins and fired Threatt because of race.
See United States Postal Service  Board of Governors v. Aikens, 460

-17-

U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983). It is not the duty of this court to evaluate whether the decisions were fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Questionable business judgment is not evidence of discrimination. See id. Moreover, courts have recognized that anti-discrimination statutes should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential." Magruder v. Selling Area Marketing, Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

In the instant case, Pendley made the decision to hire and to promote Threatt. Frank made the decision to hire Bivins, and Pendley made the decision to promote her. Plaintiffs claim that about two months after she promoted them Pendley decided to discriminate against both plaintiffs - whom she had chosen to promote instead of white co-workers who wanted the jobs - on the basis of race. It strains logic to find an explanation for why an employer would hire black applicants, give them promotions sought by white workers, and then discipline and/or fire them almost immediately *because* they are black.[10] The fact that Pendley was the

_____

[10] Plaintiffs counter that fact by suggesting that Pendley buckled under pressure from the white subordinates; however, there is no evidence that would lead a reasonable juror to that conclusion. While there is some evidence that the subordinate nurses did not like Bivins and did not always do the work they were

-18-

decision-maker in the key events "give[s] rise to a permissible inference" that there was no discriminatory motive behind the job actions about which plaintiffs complain.  <u>See Williams v. Vitro Services Corp</u>., 144 F.3d 1438, 1443 (11th Cir. 1998).

Plaintiffs' argument that similarly situated white LPNs were treated differently simply is not based in fact.  Pendley has demonstrated that white nurses also were fired for medication errors.  Threatt has failed to show that any other nurse made medication errors and then falsified the records, yet was not terminated.[11]  Both Lee and Bradley, whom Threatt offers as comparators, acknowledged on the medical records that medication had not been administered as directed.  Accordingly, they are not valid comparators because they did not falsely document that the medication was properly given.  Cummings is not a valid comparator because her error involved an mistake in accounting for narcotic pills at the end of her shift.  Cummings' error does not

_____

assigned by Bivins and Threatt, there is no evidence that the insubordination was rooted in racism.

[11]     Although Eva Bradley made both medication errors and charting errors, there is no evidence that the two errors were concurrent.  In other words, Threatt's situation appears to be more serious in that Threatt appears to have hidden her medication errors by falsifying records.  It appears that Bradley simply made more than one type of error.  In any event, even if the conduct were considered to be sufficiently similar to make Bradley a comparator, Threatt has failed to demonstrate that Bradley was treated differently in that her employment also was terminated. The only difference noted is that Bradley was allowed to resign and Threatt, apparently, was not.

-19-

necessarily involve wrongfully administering or withholding medication from a resident; nor does it include the falsification of medical records. Accordingly, Threatt has failed to demonstrate that any similarly situated non-black nurse was treated more favorably, and she has failed to present a *prima facie* case based on her termination.

Bivins' argument similarly lacks foundation in fact. Bivins was disciplined for medication errors and unprofessional behavior. She has not pointed to any white supervisory nurse who engaged in similar conduct and who was not disciplined or demoted. Moreover, even after Riverchase disciplined Bivins and determined that Bivins was not qualified to act as a supervisor, the company allowed her to return to her non-supervisory nursing position without a decrease in pay, again suggesting the lack of racial animus.

To the extent that Bivins alleges a claim arising from her second suspension, Riverchase has demonstrated that the suspension was motivated by a need to comply with state regulations regarding allegations of abuse. Furthermore, because the suspension was with pay and because Bivins was immediately reinstated without prejudice, the suspension does not qualify as an adverse employment action. Finally, any claim based on the second suspension must fail because Bivins has failed to demonstrate that any nurse from outside the protected class was similarly accused of abuse and was

-20-

not suspended.[12]  Accordingly, Bivins has failed to present a *prima facie* case that she was discriminatorily disciplined or suspended because she has failed to point to any valid comparator.

Plaintiffs further allege that they were excluded from "stand-up" meetings held for managers, and that they were not offered training that was available to white nurses.  The plaintiffs have failed to sufficiently allege that they were excluded from any specific "stand-up" meetings.[13]  Threatt admits she attended three in the brief time in which she was a manager.  Bivins alleges that the meetings were discontinued after she and Threatt became managers.  All the facts indicate that the meetings were called informally, on an irregular basis, for any managers who were available and not engaged at the time in patient care.  In any event, there is no evidence to support a claim that any exclusion, if it occurred, was racially based or that the exclusion amounted to an adverse job action.  Plaintiffs do not allege, and the record does not suggest, that the meetings played any role in any substantial condition of employment.  In other words, attendance at the meetings, if they occurred in the absence of Bivins and

---

[12]     The fact that the investigation resulted in a finding that Bivins had not engaged in the alleged abuse, and the fact that two white nurses who made the allegations were fired as a result of the false charges, belies any contention that Riverchase was acting with any racial animus toward Bivins.

[13]     There is no evidence that any lunch meetings involving any nursing functions even occurred.

Threatt, has not been shown to have been detrimental in any way to their success as managers; accordingly, plaintiffs have failed to demonstrate a *prima facie* case based on exclusion from any meetings.

Plaintiffs' arguments concerning training similarly are without merit.  The only white nurse they claim received training that they did not receive was Frank, who was trained when the facility opened on aspects of "how to set a new building up."  It is clear that Frank's position was unique in that she was required to supervise a new operation, whereas Bivins and Threatt stepped into roles in an existing facility and had opportunities to observe Frank in that position, and to be trained by Frank.  Plaintiffs have failed to demonstrate that the failure to train was in any way related to race or that the failure to train constitutes an adverse employment action.

Plaintiffs' argument that their promotions were "opposed" by white subordinates hardly merits consideration.[14]  Even if the subordinate nurses did oppose the promotions, and even if that opposition were based in racial animus, Riverchase is not liable for discrimination absent some evidence that the actions of the employees can be attributed to Riverchase managers.  In this case,

---

[14]     The "weekender" letter referred to by plaintiffs does not even mention plaintiffs, race, or any promotions.  It appears to be routine grousing by employees who felt undervalued and overworked, but does not bear any marks of racism, nor does it in any way target plaintiffs.

neither plaintiff reported to any manager that she was subjected to
any discriminatory conduct, or that she believed there was any
racial animus in the workplace.  It does appear, at least in the
case of Bivins, that her subordinates did not like her and did not
follow her instructions. Such insubordination, however unpleasant,
does not constitute discrimination.  Although Bivins claims that
Pendley and Frank fostered the insubordination, the only evidence
she offers is that Pendley once instructed nurses that they did not
have to fill out certain reports on a weekend that Bivins had
instructed them to do so.  What Bivins describes appears to be no
more than a clash of priorities in which a higher-level manager
overrode an order given by a lower-level manager.  Frustrating as
that may it, it also does not constitute discrimination.  For all
of these reasons, plaintiffs have failed to show that Riverchase
may be liable for the alleged insubordination or "opposition" of
the white nurses.[15]

Summary judgment cannot be avoided by arguments "based on
hunches unsupported with significant probative evidence."  Raney,
120 F.3d at 1198.  Plaintiffs have failed to provide "significant
probative evidence" that comparators were treated more favorably or

_____

[15]    The court also notes that the facts do demonstrate that
Bivins was not well liked by her subordinates and that at least
some of her subordinates attempted to sabotage Bivins' employment.
The two who wrongly accused her, however, were investigated by
Riverchase and were then terminated immediately.  These facts
hardly support a conclusion that Riverchase facilitated or
acquiesced to any discriminatory conduct.

-23-

that any lack of meetings or training constituted an adverse job action.   Finally, plaintiffs have failed to show that any of the allegedly discriminatory conduct engaged in by subordinate employees was made known to or facilitated by Riverchase. Consequently, neither plaintiff has established a *prima facie* case of race discrimination, and the defendant's motion for summary judgment is due to be granted.

## B.  The Employers' Legitimate, Nondiscriminatory Reason

Even if the plaintiffs had succeeded in establishing a *prima facie* case of race discrimination, the presumption of discrimination may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.   Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Because Riverchase has offered a nondiscriminatory reason for the termination of Threatt and the disciplinary action taken against Bivins, plaintiffs must, in order to overcome the motion

-24-

for summary judgment, demonstrate by competent, admissible evidence that Riverchase's nondiscriminatory reason is merely a pretext. They must show not only that Riverchase's articulated reasons for the actions are false, but also that Riverchase's true reason for firing Threatt and disciplining Bivins was race discrimination. See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).

The plaintiffs attempt to show that the proffered reason is a sham by pointing to evidence that both employees had good employment records prior to the incidents that led to the discipline and firing. Threatt asserts she had not received any disciplinary actions and had been commended for her job performance in the past. Bivins similarly asserts that she had received only one disciplinary action before her promotion to supervisor. In essence, plaintiffs argue that because Riverchase was pleased with their job performances before the alleged infractions, the articulated reasons must be pretextual. This position ignores the fact that Riverchase has stated that the reason for Threatt's termination was Threatt's apparent failure to administer medications to the residents, coupled with falsely charting that the medication had been given.[16] Bivins, on the other hand, was

---

[16] The court does not assume that Riverchase's accusations necessarily are true; Threatt denies having failed to dispense the medicine. Even so, there is no evidence that Riverchase did not reasonably believe that Threatt had failed to carry out her responsibility in dispensing the medicine on two occasions, had

disciplined because of repeated medication errors and unprofessional conduct.[17] The errors were uncovered by Frank, the decision-maker who had hired Bivins, and the disciplinary decisions were made by Pendley, who also made the decision just one month before to promote Bivins. Plaintiffs merely speculate that the real reason behind their difficulties at work may have been race discrimination. They make numerous conclusory statements to that effect in their brief in opposition to the motion for summary judgment; however, no fact in evidence logically calls into question the credibility of Riverchase's articulated nondiscriminatory reasons for firing Threatt or disciplining and demoting Bivins. Plaintiffs' speculation is not sufficient to overcome the defendant's well supported motion for summary judgment.

---

falsely documented that the medication was given, and had made some attempt to "cover up" her conduct by hiding the medication in a drawer.

[17]    To the extent that Bivins attempts to state a claim based on the second suspension it must fail. Bivins was suspended after she was accused, albeit wrongfully, of abusing a patient. Pendley has testified that Bivins was suspended with pay in order for Riverchase to investigate the allegations, as required by state regulations. Once the investigation was completed, Bivins was immediately reinstated. Moreover, the white employees who made the false allegations were promptly fired. This fact alone indicates that Riverchase harbored no racial animus toward Bivins. The fact that two white employees may have had such racial bias does not reflect that the employer had any discriminatory motive. The undisputed facts relating to Bivins' second suspension support, rather than refute, the employer's articulated reason for Bivins' earlier discipline.

-26-

The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury." Combs, 106 F. 3d at 1526.   The court finds no support for plaintiffs' argument that the reasons are pretextual.  Furthermore, in light of the serious nature of the medication errors, and in light of the complete absence of any evidence that any decision-maker at Riverchase had any discriminatory motive, the evidence is so one-sided that the defendant must prevail.

The court finds that plaintiffs have failed to meet their secondary burden of showing that Riverchase's stated reasons for dismissing Threatt and disciplining and demoting Bivins were pretextual, and their claims of race discrimination under both Title VII and § 1981 are subject to summary adjudication in favor of the defendant under the burden-shifting test as adopted by the Eleventh Circuit Court of Appeals.

### C.  Retaliation

The defendant asserts that plaintiffs' claims are due to be dismissed because both have failed to establish a *prima facie* case of retaliation.   In order to survive a properly supported motion for summary judgment, the plaintiff in a Title VII retaliation case must establish a *prima facie* case by showing: (1) that she engaged in protected conduct and (2) suffered an adverse employment action, that was (3) causally linked to the protected expression.  Taylor

-27-

v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).  In addition, the plaintiff must show that her employer was aware of her participation in the protected activity when it took the adverse action.  Maniccia v. Brown, 171 F.3d 1364,1369 (11th Cir. 1999).

In this case, the only protected activity Bivins engaged in occurred on March 22, 2001, when she filed her EEOC charge.  There is no evidence that she engaged in any activity to oppose the alleged discrimination before her March 10 suspension.  As for Threatt, any claim that she was discharged in retaliation for opposing discrimination is without merit for the same reasons her race discrimination claims fail - Riverchase has demonstrated that it fired her for a legitimate, nondiscriminatory reason, and she has failed to show that the reason is pretextual.  Accordingly, defendant is entitled to summary judgment on any retaliation claim brought by either plaintiff.

### IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by defendant in support of the motion for summary judgment, and in light of the plaintiffs' failure to meet their burden of coming forward with evidence sufficient to create a genuine issue of material fact, this court determines that defendant's motion for summary judgment against plaintiffs is due

to be GRANTED and all of plaintiffs' claims are due to be DISMISSED
WITH PREJUDICE.

A separate order will be entered in accordance with the
findings set forth herein.

DATED this __6__<sup>th</sup> day of _November_, 2002.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE